1  **LESOWITZ GEBELIN LLP**
2  Steven T. Gebelin (SBN 261507)
        steven@lawbylg.com
3  8383 Wilshire Boulevard, Suite 800
4  Beverly Hills, CA 90211
   Telephone: (310) 341-3072
5  Facsimile:  (310) 341-3070

6
   Attorneys for Defendants
7  *Groomore, Inc. and Chunliang Lin*

8                  **UNITED STATES DISTRICT COURT**
9                  **CENTRAL DISTRICT OF CALIFORNIA**

10
   MOEMENT, INC., a Delaware              Case No. 2:22-cv-02871-WLH-KS
11 corporation,
                                          [Assigned to the Hon. Wesley L. Hsu;
12          Plaintiff,                    Courtroom 9B]
13
14     v.                                 **[DEFENDANTS' PUBLIC**
                                          **REDACTED]**
15 GROOMORE, INC., a Delaware             **MEMORANDUM IN SUPPORT OF**
   corporation, CHUNLIANG LIN, an         **DEFENDANTS' MOTION TO**
16 individual, JIE ZHANG, an individual, and **EXCLUDE OPINIONS FROM**
17 SONGYUN LIU, an individual,            **PLAINTIFF'S RETAINED**
                                          **DAMAGES EXPERT MARYELLEN**
18          Defendants.                   **SEBOLD REGARDING (1) "LOST**
19                                        **PROFITS"; (2) "COSTS**
                                          **ATTRIBUTABLE TO THE**
20                                        **DEVELOPMENT OF MOEGO"; and**
21                                        **(3) "REASONABLE ROYALTY";**

22                                        **Judge: Hon. Wesley L. Hsu**
23                                        **Date:   October 18, 2024**
                                          **Time:  1:30 pm**
24                                        **Ctrm:      9B**
25
26
27
28

---

*Moement Inc. v. Groomore Inc., et al..*                    **Defendants' Motion to Exclude Certain Expert**
USDC, Case No. 2:22-cv-02871-WLH (KS)                       **Opinions of Plaintiff's Expert Maryellen Sebold**

# **Table of Contents**

Contents

I.  INTRODUCTION ..................................................................................1

II. BACKGROUND FACTS ......................................................................2

    **A.**               **Background** ..................................................................2

    **B.**               **Sebold's Expert Opinions.** ........................................2

        *1.*         *Sebold's Opinion 1- "Lost Profit Damages Analysis".*  3

        *2.*         *Sebold's Opinion 2- "Costs Attributable to the Development of MoeGo".* ..............................................4

        *3.*         *Sebold's Opinion 3- "Costs Attributable to the Development of Trade Secret".* ..........................................4

        *4.*         *Sebold's Opinion 4- "Reasonable Royalty" Pursuant to 18 U.S.C. § 1836* ...............................................5

III. LEGAL STANDARDS. ........................................................................6

    **A.**               **Expert Witness Testimony** ........................................6

    **B.**               **Damages.** ....................................................................9

IV. ARGUMENT. ......................................................................................10

    **A.**               **Sebold's Opinion 1 is Unreliable and Must Be Excluded.**  10

        *1.*         *Sebold's Opinion 1 Has No Reliable Explanation of Causation Necessary to Link Groomore's Actual or Forecasted Revenues to Moement Lost Profits And Ignores Contradictory Evidence.* ...............................................10

        *2.*         *Sebold's Opinion 1 Has No Reliable Basis for Post-Trial Damages.* .....................................................13

        *3.*         *Sebold's Opinion 1 Fails to Reliably Use a Reliable Forecasting Method.* ...........................................14

        *4.*         *Sebold's Opinion 1 Fails to Apportion Revenues to Defendants' Acts Alone or to the Trade Secrets.* .....15

    **B.**               **Sebold's Opinion 2 of "Costs Attributable to the Development of MoeGo" Is Unreliable, Unhelpful, and Inadmissible Opinion.** ...............................................16

C.       Sebold's Opinion 4 of a "Reasonable Royalty Rate" Is Unreliable, Unhelpful, and Inadmissible Opinion.       17

    1.       Reasonable Royalty is Not a Jury Theory for Trade Secret.       17

    2.       Sebold's Royalty Rate is Not Based on Comparable Licenses. ....................................................17

    3.       Sebold Provides No Good Explanation to Extend the Royalty Rate Post Trial. .................................18

V.    Conclusion. .......................................................................18

## Table of Authorities

**Cases**

*Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511
F. App'x 398, 403 (6th Cir. 2013) .................................................................. 12

*Atl. Inertial Sys., Inc. v. Condor Pac. Indus. of California, Inc.*, 545 F.
App'x 600, 601 (9th Cir. 2013) ..................................................................... 19

*Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998) ............................. 9

*Claar v. Burlington N.R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) ......................... 9

*Copart, Inv. C. Sparta Consulting, Inc.*, 277 F.Supp.3d 1127, 1155
(E.D. Cal. 2017).......................................................................................... 19

*Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311,
1316 (9th Cir. 1995) ..................................................................................... 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 US 579 (1993) ....................... 1

*DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) ....................... 8

*Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025- 26 (9th Cir.
2022)........................................................................................................ 8

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)................................... 8, 9, 10

*Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120
(S.D.N.Y. 1970), modified sub nom. Georgia-Pac. Corp. v. U.S.
Plywood-Champion Papers, Inc., 446 F.2d 295 (2d Cir. 1971)................... 20

*Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*, 525 F. Supp. 3d
1145, 1246 (S.D. Cal. 2021)........................................................................ 11

*Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1016. (9th
Cir. 2004.)................................................................................................ 18

*Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 87 F. Supp.
3d 928, 939 (N.D. Cal. 2015) ...................................................................... 8

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales
Practices, & Prod. Liab. Litig.*, 978 F. Supp. 2d 1053, 1064
(C.D. Cal. 2013) ...................................................................................... 10

*Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998) ........................ 8

*Kumho Tire Co., Ltd. v. Carmichael*, 526 US 137 (1999) .................................. 1, 7

*Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir.1993) .................. 11

*ProMex, LLC v. Hernandez*, 781 F. Supp. 2d 1013, 1019 (C.D. Cal.
2011)........................................................................................................ 11

*Ringcentral, Inc. v. Quimby*, 711 F. Supp. 2d 1048, 1062 (N.D. Cal. 2010), *vacated in part*, 781 F. Supp. 2d 1007 (N.D. Cal. 2011)..................11

*Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1018 (C.D. Cal. 2018) ........................................................................7, 10

*United States v. Christophe*, 833 F.2d 1296, 1299 (9th Cir. 1987)..........................8

*United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019)....................................................................................................7, 9

*United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993)........................18

**Statutes**

18 U.S.C. § 1836.....................................................................9, 13, 16

Federal Rule of Civil Procedure 26 .........................................................11

Federal Rule of Evidence 702...........................................................1, 6, 7

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

This Motion challenges opinions proffered by Plaintiff Moement, Inc. ("Plaintiff" or "Moement") through its retained damages expert Maryellen Sebold that: (1) Plaintiff suffered a total "lost profits" damage of $███████, including $███████ in lost profits damages from lost profits from April 1, 2021, to December 9, 2024 and $███████ from December 10, 2024, to December 31, 2027 in connection with the alleged misappropriation of Plaintiff's backend code at issue in this case by Defendants Groomore Inc. ("Groomore") and Chunliang Lin ("Lin") (collectively "Defendants") (*see, e.g.* ¶¶ 10, 43-97, 118, Section E, and any supporting schedules of the July 31, 2024 produced Seabold Report[1] and/or the August 6, 2024 produced Supplemental Sebold Report[2]); (2) Plaintiff may claim as damages the "Costs Attributable To The Development Of Moego" in the amount of $███████ (see, e.g. ¶¶ 11, 100-108, 119,, Section "G", and any supporting schedules of the SR and/or SSR); and (3) The "Reasonable Royalty for Defendants' Breach" of $███████ is an alternative measure of damages attributable to Defendants' alleged misappropriation of Plaintiff's backend code at issue in this case (*see, e.g.* ¶¶ 14 112-116, Section I, and any supporting schedules of the SR and/or SSR).

These opinions are inadmissible under FRE 702 *et seq.*,  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 US 579 (1993), *Kumho Tire Co., Ltd. v. Carmichael*, 526 US 137 (1999), and additional implementing authority. Plaintiff cannot establish by a preponderance of the evidence that these opinions are reliable.

---

[1] Declaration of Steven T. Gebelin ("Gebelin Decl.") ¶ X, Ex. B (the "SR").

[2] Gebelin Decl. ¶ X. Ex C (the "SSR"); Except where Defendants are aware of a difference in the two, references will generally be to the SSR rather than the SR.

## II. <u>BACKGROUND FACTS</u>

### A.     <u>Background</u>

Moement develops and offers an online pet grooming scheduling software system called "MoeGo" which is available on the web at moego.pet and via downloadable mobile application. Dkt. No. 1 ("Complaint") ¶¶ 3, 18. Groomore offers a competing online pet grooming scheduling software system called "Groomore" available at groomore.com and via associated mobile applications. *Id.* ¶ 11. Lin is a former software engineer for Moement that worked on various aspects of MoeGo software and who founded Groomore in October 2020. *Id.* ¶¶ 4, 9. Moement's core allegations are (1) that on June 5, 2020 co-defendant Jie Zhang downloaded without authorization "a full copy of the Moego v.1 backend source code" comprised of the "Moement Trade Secrets" which are defined as "148 files consisting of 93,058 lines of confidential and proprietary computer scripts that took Moement at least 25,000 engineering hours to create" and for which Moement registered a copyright (i*d.* ¶¶ 6, 42) and (2) that by copying and misappropriating the "MoeGo v.1 backend code" Defendants were "able to easily and quickly replicate a broad range of Moego's unique algorithm logic and features." *Id.* ¶ 12.

### B.     <u>Sebold's Expert Opinions.</u>

On July 31, 2024, Plaintiff served the "Expert Report of Maryellen Sebold" and on August 6, 2024 Plaintiff served the "Supplemental Expert Report of Maryellen Sebold." The supplemental report was largely identical to the timely served expert report, except that it altered the methodology used and resulting opinion by Ms. Sebold for the calculation of her opinion as to her Opinion 3, as discussed in section II.B.3 below. On August 27, 2024[3], Defendants took the deposition of Ms. Sebold concerning her expert opinions expressed in her reports, marking the July 31, 2024 report as Exhibit 154 and the August 6, 2024 report as Exhibit 155. Gebelin Decl.

---

[3] Following her designation as an expert, Plaintiff offered Ms. Sebold for deposition "the week of August 26, 2024." Gebelin Decl. ¶ 6**, Ex. D**;

¶ 3, **Ex. A** (Sebold Deposition Transcript ["Sebold Depo."]).  Ms. Sebold confirmed that each of her damage opinions rely on the assumption that there was a misappropriation of Moement's trade secrets by Defendants. Sebold Depo. 21:3-22:14.  Ms. Sebold testified that she is a full time forensic accounting expert and only spends about 7% of her time on intellectual property cases.  *Id*. 7:11-16 (70% of workload is as testifying expert, 30% doing forensic accounting investigations) and 8:22-9:2 (10% of work as testifying expert involves intellectual property matters).

## 1.    *Sebold's Opinion 1- "Lost Profit Damages Analysis".*

Ms. Sebold's expert reports set forth a "Lost Profit Damages Analysis" in which she opines that Moement's lost profits are measured by applying a "net variable profit margin" to all of the revenue that she speculates would have been made by a hypothetical combined **Groomore** and **Moement** entity through December 31, 2027, compared to Moement's actual and projected revenues and then discounting the projected future amounts to present value.  SSR  ¶¶ 43- 97.

Ms. Sebold calculates the revenues of this hypothetical entity by adding (1)  Groomore's actual revenues from Groomore's first recorded revenue until March 31, 2024 based on Groomore's produced data [SSR ¶¶ 70-74, 76, Schedules B.1, C.1] (2) the difference in the projected revenues that would be made by a hypothetical combined Moement and Groomore from April 1, 2024 through the December 9, 2024 (the date of trial) by following the linear regression growth trend of the hypothetical combined entity less the projected revenues of Moement for the same period but following the lower linear regression growth trend line for Moement alone starting from the lower Moement base revenue [SSR ¶¶ 75-76, Schedules B.1, C.2]; and (3) the difference between the projected revenues of the hypothetical combined entity (still growing at the higher linear regression growth rate for the combined entity) and the projected revenues of Moement alone (again still growing at the lower linear regression growth rate for Moement alone) projected until December 31, 2024 [SSR ¶¶ 83-86, Schedule B.2].

1    Ms. Sebold calculated her "net variable profit margin" by looking at
2    Moement's profit and loss statements from January 1, 2019, through March 31, 2024,
3    evaluating which costs would impacted by incremental additional services to
4    customers (*i.e.* variable costs), calculating the net variable costs for Moement for each
5    year between January 2019 and March 2024, and averaging that amount.  [SSR ¶¶ 87-
6    92, Schedules D.1, D.2].  Finally Ms. Sebold discounts the projected "future" profits
7    (*i.e.* those from December 10, 2024 to December 31, 2027) by a cost of equity capital
8    calculated under a Build-up model of 21.4%.

9    Sebold thus opined there were "lost profits" of (1) ███████ for the three years
10   between April 2021 through March 31, 2024, (2) ███████ for the approximately
11   nine months between April 1, 2024 through December 9, 2024, and (3) ███████
12   for December 10, 2024 through December 31, 2024.  SSR ¶ 97, Schedules B.1, B.2.

13   In developing her lost profits opinion, Sebold assumed that the entire MoeGo
14   platform was at issue, not just the backend code.  Sebold Depo. 83:3-9.

15   **2.    Sebold's Opinion 2- "Costs Attributable to the Development of MoeGo".**

16   Ms. Sebold's expert reports also set forth an opinion regarding the development
17   costs of the entire MoeGo platform or software service, including backend, frontend,
18   design, UI/UX development, or other software engineering payroll related expenses.
19   SSR ¶¶ 100-108, Schedule G.1; *see also* Sebold Depo. at 62:13-66:1.  She calculated
20   this amount as ███████, which included both the Chinese affiliate's payroll and
21   additional payments to defendants Lin, Zhang, and Liu from Moement.

22   **3.    Sebold's Opinion 3- "Costs Attributable to the Development of Trade**
23   **Secret".**

24   Ms. Sebold's two expert reports also set forth two separate opinions regarding
25   the development "Costs Attributable to the Development of Trade Secret". *i.e.* the
26   MoeGo v.1 backend software code as opposed to the entire MoeGo software platform.
27   SR at ¶¶ 109-11, SSR at ¶¶ 109-11; *see also* Sebold Depo. 71:3-12.

28

Her first and timely produced report calculated this amount by "apportioning" the total costs of software development at Moement's Chinese operations (*i.e.* Moement's Chinese affiliate Shenzhen Mengzhike Technology Co.) by the estimated percentage of software engineering time spent on "backend development" of MoeGo v.1 (as opined by Dr. Craig Rosenberg, another of Plaintiff's experts), resulting in an apportioned cost of $ ███ . [*see* SR ¶¶ 109-11, Schedule G.2]

Her second "supplemental" or amended report calculated this by solely looking at the salaries paid to defaulted co-defendant Jie Zhang[4] and dismissed co-defendant Songyun Liu[5], resulting in a cost of $ ███ . S*ee* SSR ¶¶ 109-111].

Rather than acknowledging this wholesale change in methodology, Plaintiff's counsel represented that the "amendment (or supplement) to the damages report" of Sebold was due to the correction of an "error was attributable to Ms. Sebold using Chinese currency estimates for the software developers primarily responsible for MoeGo v.1 when those employees' salary was actually paid in US dollars. Otherwise, the report is exactly the same." Gebelin Decl. ¶ 6, **Ex. D**. Ms. Sebold's explanation for the change was that it was "brought to her attention" by counsel that her initial report did not include the U.S. payroll for these two defendants and she was subsequently informed that "all of their time, U.S. and China, was spent on the development of trade secrets." Sebold Depo 14:23-15:24.

### 4.    Sebold's Opinion 4- "Reasonable Royalty" Pursuant to 18 U.S.C. § 1836

Finally, Ms. Sebold's expert reports set forth an opinion regarding the "alternative remedy" of a "reasonable royalty." SSR at ¶¶ 112-116, Schedule I.1. For this analysis, Ms. Sebold determined the base amount by using both the tabulated

---

[4] Zhang worked for Moement as "a backend developer that primarily developed the backend source code for Moego v.1 and the framework of the upgraded Moego v.2 software." Complaint ¶ 5.

[5] Liu worked for Moement as "a Tech Lead… primarily responsible for developing Moement's core platform known as 'Moego'," including "the development, testing, debugging, and maintenance of the first version of the Moego software known as Moego v.1… the development of the associated Android and iOS mobile applications for Moego, as well as the framework design of the later upgraded Moego v.2 software." Complaint ¶¶ 3-4.

Groomore revenues from April 1, 2021 through March 31, 2024 and a projection of Groomore's revenues using a linear regression model (of Groomore's business only), and discounting future revenues to present values at a 21.4% rate. *Id.*

She also relied upon a 2010 survey of publicly disclosed "licensing agreements in the software industry" which analyzed 2,963 agreements disclosed in submissions to the U.S. Securities & Exchange Commission (SEC) from 1994 to 2009. SSR ¶ 114, *see also* Gebelin Decl. **Ex. E**[6]. Based on this article, Sebold selected the "median rate" for 10% for all types of disclosed "royalty" licenses in the "Software Industry". *Id.* Ms. Sebold did not do any analysis of the underlying licenses to determine if they were comparable to a hypothetical license in this case, and testified that she was "not even sure there would be much out there" for comparable licenses to one for "MoeGo" and she didn't see any that would be comparable. Sebold Depo 71:22-72:2, 74:4-17. Sebold also described her selection of the 10% rate as her "looking at the range of royalty rates that are generally used. And in looking at that, determined kind of a mid point of ten percent and used that as a reasonable royalty." Sebold Depo. 73:21-74:3.

This analysis results in Ms. Sebold opining that the reasonable royalty payments that Groomore would owe as follows: $███ for April 1, 2021, to March 31, 2024, $███ for April 1, 2024 through December 31, 2024, and $███ for January 2025 through December 2027. SSR Schedule I.1.

## III.  LEGAL STANDARDS.

### A.  Expert Witness Testimony

FRE 702 specifically provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and

---

[6] Varner, Thomas R., "Technology Royalty Rates in SEC Filings," *les Nouvelles*, Journal of the Licensing Executives Society International, Vol. XLV, No. 3, September 2010, pp. 120-127

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Under Ninth Circuit law, the exclusion of expert testimony is discretionary. *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019). The controlling procedural legal standards are provided under Federal Rules of Civil Procedure 702 and 703, as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), which require "the district court [to] perform a 'gatekeeping role' of ensuring that the testimony is both 'relevant' and 'reliable' under Rule 702." *Ruvalcaba-Garcia*, 923 F.3d at 1188. This applies to all expert testimony, not just scientific testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148-149 (1999) (applying to all expert testimony).

"The proponent of the expert testimony has the burden of proving that the proposed expert testimony is admissible under Federal Rule of Evidence 702, *Daubert*, and its progeny." *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1018 (C.D. Cal. 2018) (emphasis added, citation omitted).

The Court's inquiry should focus on "whether the jury will receive appreciable help from expert testimony." *United States v. Christophe*, 833 F.2d 1296, 1299 (9th Cir. 1987) (internal quotations omitted). Expert "testimony must be grounded in the methods and procedures of science and signify something beyond subjective belief or unsupported speculation." *Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 87 F. Supp. 3d 928, 939 (N.D. Cal. 2015) (internal quotation marks omitted). Each opinion must have "analytically sound bases." *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998). And those bases must be "connected to existing data" through reliable means, not "the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

For expert testimony to be reliable, it must be "based on sufficient facts or data" and be "the product of reliable principles and methods." Fed. R. Evid. 702(b)– (c). This element requires the opinion to be built on "sufficient factual grounds on which

to draw conclusions." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025- 26 (9th Cir. 2022); *see also Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998) ("[T]he focus of the inquiry envisioned by Rule 702 must be on the principles and methodology underlying an expert's testimony, not on the conclusions."). An expert's opinions are not reliable where the expert bases his conclusions on "mere subjective beliefs or unsupported speculation." *Claar v. Burlington N.R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994). "An opinion based on ... unsubstantiated and undocumented information is the antithesis of the scientifically reliable expert opinion admissible under *Daubert* and Rule 702." *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998). In determining the reliability of proffered expert testimony, the district court's task "is to analyze not what the experts say, but what basis they have for saying it." *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1316 (9th Cir. 1995). "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co.*, 522 U.S. at 146. To avoid this disconnect, the proponent of expert testimony must "explain the methodology the experts followed to reach their conclusions [and] point to any external source to validate that methodology." *Daubert II*, 43 F.3d at 1319. *Daubert* challenges are directed to "the soundness of the methodology" rather than "the correctness of the expert's conclusions." *Ruvalcaba-Garcia*, 923 F.3d at 1189 (citations omitted). However, "the Supreme Court has cautioned that 'conclusions and methodology are not entirely distinct from one another.'" *Townsend*, 303 F. Supp. 3d at 1019 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). The harm in admitting such testimony is distinct from ordinary fact testimony, in that juries may unduly defer to an expert "considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony." *In re Toyota Motor*

1  *Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 978 F.
2  Supp. 2d 1053, 1064 (C.D. Cal. 2013) (emphasis added, citation omitted).

3  **B.    Damages.**

4       The Defend Trade Secrets Act offers a trade secret plaintiff the greatest of three
5  distinct calculations for compensatory damages.  18 U.S.C. § 1836(b)(3)(B). Under
6  the DTSA, a Plaintiff is entitled to "(I) damages for actual loss caused by the
7  misappropriation of the trade secret; and (II) damages for any unjust enrichment
8  caused by the misappropriation of the trade secret that is not addressed in computing
9  damages for actual loss," § 1836  (b)(3)(B)(i), or "in lieu of damages measured by
10  any other methods, [the district court may award] damages caused by the
11  misappropriation measured by imposition of liability for a reasonable royalty for the
12  misappropriator's unauthorized disclosure or use of the trade secret," § 1836
13  (b)(3)(B)(ii).

14       "It is generally improper for Plaintiffs, as here, to measure damages by the gain
15  to the Defendants, rather than the loss to the Plaintiffs" because such claims require
16  evidence that show a defendants' revenues are "directly correlated to Plaintiffs' loss
17  above the speculative level," and cannot be based on a naked assumption that "but for
18  Defendants' sales, Plaintiffs would have made the same exact sale to the same
19  entities… during the relevant period," and instead requires evidence to "support such
20  a determination with reasonable certainty"; absent such evidence, "basing Plaintiffs'
21  [lost profits] damages solely on Defendants' profits is too speculative, and as a result,
22  improper." *ProMex, LLC v. Hernandez*, 781 F. Supp. 2d 1013, 1019 (C.D. Cal. 2011).

23       "As a general rule, damages which result from a tort must be established with
24  reasonable certainty.... Damages are not rendered uncertain because they cannot be
25  calculated with absolute exactness, yet, a reasonable basis for computation must
26  exist." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir.1993) (internal
27  quotation marks omitted).

28

Where a plaintiff may recover disgorgement of defendant's profits and any other damages sustained by the plaintiff, the "plaintiff may establish the amount of damages by showing the plaintiff's lost profits or by showing the defendant's unjust enrichment in the form of profits attributable to the infringing activity." *Ringcentral, Inc. v. Quimby*, 711 F. Supp. 2d 1048, 1062 (N.D. Cal. 2010), *vacated in part*, 781 F. Supp. 2d 1007 (N.D. Cal. 2011) "Damages that are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery." *Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*, 525 F. Supp. 3d 1145, 1246 (S.D. Cal. 2021).

## IV. ARGUMENT.

### A. Sebold's Opinion 1 is Unreliable and Must Be Excluded.

Sebold's Opinion 1 regarding "lost profits" is not based on the reliable application of reliable methods to reliable data. Rather than make any attempt to calculate changes in Moement's actual profits she improperly (1) presumes that **all sales** from Groomore and a hypothetical Groomore – Moement conglomerate would have resulted in profits to Moement despite lots of evidence to the contrary; (2) arbitrarily extends damages for three years post-trial; (3) uses an novel and unsupported forecasting model to speculatively boost forecasted revenues; and unreliable

*1. Sebold's Opinion 1 Has No Reliable Explanation of Causation Necessary to Link Groomore's Actual or Forecasted Revenues to Moement Lost Profits And Ignores Contradictory Evidence.*

"Lost profit damages are measured by the loss, including lost profits the plaintiff business sustained as a result of the tortious interference, *not by its effect upon the defendant's business,*" and in contrast "unjust enrichment is a theory of restitution based, not upon a plaintiff's loss, but a defendant's gain." *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 403 (6th Cir. 2013) (approving jury instruction requiring that trade secret plaintiff prove

defendants' customers would have bought its product to establish lost profits). This means that in a marketplace with competitors that do not rely on the trade secret at issue, the plaintiff must establish that customers would have bought from it rather than the defendant to establish a lost profits theory. *Id.* Allowing a theory that "lost profits may be established *solely* on the basis of profits the defendant gained through its misappropriation would allow recovery even in the absence of evidence that the plaintiff in fact suffered loss and would blur any distinction between the unjust-enrichment and lost-profits theories of damages." *Id.* (emphasis in original).

Sebold's report makes no explanation for why she assumes that all revenues that have been (or she projects will be) earned by Groomore would have instead flowed to Moement. There is no analysis of the relevant marketplaces or market shares of Moement or Groomore against any of numerous direct and indirect competitors for their potential customers, there is no explanation of any change to Moement's revenues or market share due to Groomore's entry into the market, no explanation concerning whether Groomore's customers came to it rather than Moement because of the allegedly misappropriated technology or any other reasons (such as customer service or support for certain features not in the allegedly misappropriated trade secrets), or any other basis to rationalize her assumption of causation. *See* SSR ¶ 47 (Sebold assumes "both liability and causation" and provides no opinions regarding either).

> (a)    *Sebold Ignored Evidence Contradicting her Assumption that Moement Would Gain all of Groomore's Revenues in a "But For" World.*

Not only did Sebold assume that all of Groomore's sales (and the sales of the hypothetical Groomore-Moement Frankenstein of a company) would have gone to Moement, she ignored data from her report and Moement's documents that clearly contradicted this speculative leap. In support of both the lost profits and her reasonable royalty opinion Sebold provided her own calculation (without direct citation to supporting evidence in violation of FRCP 26(a)(1)(A)(iii)-*see* SSR at

Schedule F.1) that she determined an overlap of ▉ of Groomore's registered customers that were previously registered Moement customers. SSR ¶¶ 41, 115. This was only ▉% of Groomore's ▉ identified customers, and the portion of new registrations was decreasing over time. *See* Gebelin Decl. **Ex. F** (the "Irvine Rebuttal") at ¶ 53. Moreover, in discovery Moement produced ▉ survey of ▉ customers that canceled their MoeGo subscriptions between March 2022 and March 2024; their responses identified at least ▉ different software alternatives the Moement customers switched to and preferred to use over MoeGo, of those former customers identifying their preferred software alternative only ▉ identified Groomore while ▉ instead identified Square and ▉ identified DaySmart. *See* Irvine Rebuttal ¶ 24, 50, Schedule 5.0 (customers identifying preferred other software); *see also* Schedule 7.0 (reason types for leaving MoeGo). Similarly, Sebold makes no mention or analysis of whether Moement would have had capacity to service all of Groomore's customers. *See* Irvine Rebuttal ¶¶ 46-48.

Further casting doubt on the uncertain causal link between Groomore's sales and lost profits to Moement, Moement's sales data showed that rather than ▉ when Groomore entered the market in April 2021, Moement's revenue growth ▉. Irvine Report ¶ 48. Notably, Sebold's report failed to include any of Moement's revenue figures predating Groomore's entry into the market that would be the typical evidence of a resultant change to Moement's own profits. *See, e.g.* SSR at Schedule C.1 (showing Moement's monthly revenue starting in April 2021).

By failing to present evidence of a causal link between the claimed harm and the measure of damages in her lost profits analysis, Sebold's analysis fails to even follow the guidelines of the economics practice guides that she relied upon, let alone other guides and peer reviewed papers that would be reasonably relied upon by those in her industry. *See* Irvine Rebuttal ¶¶ 43-47, 52, 55, 57.

2.    *Sebold's Opinion 1 Has No Reliable Basis for Post-Trial Damages.*

In this case, where all of her damages calculations were premised on the assumption that Defendants misappropriated Moement's claimed trade secret, Sebold makes the incredibly unusual and completely *ipse dixit* decision to continue to forecast damages through December 2027, more than three years after the scheduled end of the trial.  This is despite the fact that if Plaintiff were to prevail on its trade secret claim it has asked for and would be entitled to a permanent injunction preventing Defendants from further misappropriation of the trade secrets.  *See* Compl. p. 19 at Prayer for Relief ¶ 1; 18 U.S.C. § 1836(b)(3)(B).

In her report, Sebold's only explanation for extending her rapidly growing revenue base for an additional three years is citation to a practice aid for the proposition that sometimes "plaintiff's operations are permanently affected and may never return to 'normal'," and her statement "Given the Defendants' breach against Moement, and considering Groomore's growth, I decided the loss period end date to be approximately three years after the Trial date, or December 31, 2027."  Ex 155 ¶ 59.  This is not any sort of explanation or justification for extending the damages period beyond the date of trial in light of the claims, and flies in the face of the relief that Moement is seeking in this case.  The extension serves only to articficially inflate the damages figures presented by Sebold for "lost profits", with ▮▮▮▮ of her calculated "lost profits" occurring post-trial.  *See* Irvine Rebuttal ¶ 63.

Apparently realizing that there was insufficient justification for this legally specious extension of the damages period, at deposition Sebold further supplemented her report, stating for the first time weeks after Plaintiff was required to show the evidentiary support for its damages claims that she meant (but did not explicitly say anywhere in the report) that Groomore was able to enter the market three years early based on the assumed misappropriation and that's the basis for looking an additional three years beyond trial.  Sebold Depo. 42:13-44:22.  Ms. Sebold admitted that this meant she assumed Groomore would have taken three years to enter the market

without misappropriation, but refused to state how a one year entry into the market would have changed the appropriate time to extend damages beyond trial, belying the lack of any method behind her arbitrary selection, let alone a reliable one. *Id*. 41:2-42:12. Ms. Sebold's assertion that Groomore entered the market three years faster than it would have without misappropriation both fails to explain any need to extend a damages period to more than seven years after Groomore allegedly entered the market in October 2020 (*see* Compl. ¶ 43) and is contradicted by Moement CEO testifying that ██████████████████████████████████████████████ ███████████████████████████████[8].

3.     *Sebold's Opinion 1 Fails to Reliably Use a Reliable Forecasting Method.*

In addition to the above errors that serve only to unreasonably inflate Plaintiff's claimed "lost profits" in the face of its increasing revenue growth, Sebold's Opinion 1 relies upon a completely novel and arbitrary method of projecting future revenues for Groomore sales by projecting based on a mutant combined company that has growth outstripping either Moement on its own (*see* SSR ¶ 75 and Table 2) or Groomore on its own (*see* SSR ¶ 116, Schedule I.1), using Groomore's relatively current higher growth rate (as a lower revenue company than Moement) to artificially boost the growth rate of the two company's combined revenues. *See also* Irvine Rebuttal ¶¶ 66-75. While the projections used in the reasonable royalty calculation only grow Groomore's revenue by ████ per month, Sebold's forecast for lost profits implicitly assigns additional revenue to the Groomore part of the Franken-company of ████ an order of magnitude higher, and almost double Moement's monthly revenue growth on its own of ████. Irvine Rebuttal ¶¶ 70, 72. This is incredibly speculative and lacks a reliable basis or explanation of why Groomore combined into Moement would grow revenue ten times faster and that Groomore portion would grow

---

[7] Gebelin Decl. **Ex. G**- Excerpts of July 12, 2024 Deposition of Ethan Dong ("Dong Depo.") at 163:9-164:19
[8] Dong Depo. 28:1-10.

revenue at nearly double the dollars of Moement's share. *Id.* Sebold makes no mention of and provides no explanation for the vast disparity caused by her use of such a novel model, and Defendants' expert Irvine has never seen such a calculation in her decades of experience in intellectual property valuation expert work. *See* Irvine Rebuttal ¶ 68. Sebold's forecasting model in her "lost profits" analysis is not a reliable application of "reliable principles and methods" as required under FRE 702, and this further requires exclusion of this opinion.

*4.     Sebold's Opinion 1 Fails to Apportion Revenues to Defendants' Acts Alone or to the Trade Secrets.*

Sebold's lost profit analysis is "pertaining to financial damages sustained by Moement due to Groomore, Lin, Zhang, and Liu's actions in this Dispute." SSR ¶ 47. Nowhere in the lost profit Opinion 1 does she apportion any of the lost profits to the now dismissed defendant Liu or defaulted defendant Zhang.

Similarly, Sebold makes no attempt to acknowledge or apportion any portion of Groomore's sales based on the proportion of the assumed trade secret misappropriation as a part of Groomore's product, despite her acknowledgement elsewhere in her report that Plaintiff's technical expert estimated that only ███ of Moement's software development costs were attributable to the backend code as opposed to non-trade secret portions of MoeGo. See SR at ¶110. Instead, for this opinion Sebold assumed that the entire MoeGo platform was at issue, not just the backend code. Sebold Depo. 83:3-9.

****

For the foregoing reasons, Sebold's "Opinion 1- Lost Profits" is not reliable expert measure of Moement's "actual loss" but instead an unsupported, unreliable, inflated, arbitrary, *ipse dixit* extended, and inadmissible opinion regarding Groomore's actual and unreliably projected profits.

**B.     Sebold's Opinion 2 of "Costs Attributable to the Development of MoeGo" Is Unreliable, Unhelpful, and Inadmissible Opinion.**

Sebold's Opinion 2 claims to present a form of "unjust enrichment" available under the DTSA or CUTSA, but is not limited to only the "unjust enrichment caused by the misappropriation of the trade secret." *C.f.* 18 U.S.C. § 1836(b)(3)(B)(ii), Cal. Civ. Code § 3426.3(a).  Instead, in her Opinion 2 (as opposed to her two different Opinions 3), Sebold makes the incorrect legal conclusion that under the DTSA and CUTSA "Moement can claim the development costs of [the entire] Moego [software platform] as damages."  SSR ¶ 100-108, Schedule G.1.  As an initial matter, it is well settled, "that the judge instructs the jury in the law," and "Resolving doubtful questions of law is the distinct and exclusive province of the trial judge," and not an expert. *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993).  Similarly, "an expert witness cannot give an opinion as to her legal conclusion, *i.e.*, an opinion on an ultimate issue of law." *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1016. (9th Cir. 2004.)

Sebold testified that she did not apportion any of Moement's software development costs for the entire MoeGo software system to only the v.1 backend code that is the claimed trade secrets [*e.g.* Complaint ¶ 6] and instead "included all of its as though all of it was a trade secret."  Sebold Depo 61:13-62:11.  In her original report, Sebold acknowledged that Plaintiff's technical expert broke out Moement's various software development work across categories including "MoeGo v.1 backend code- iOS application", "MoeGo v.1 backend code- Android application", "MoeGo frontend code (website & mobile application)", "MoeGo user interfaces (website & mobile application)" and "MoeGo design logic (website & mobile application)" and that only 27 % of the estimated time spent was estimated to be spent on backend code, which she called the "trade secret development hours."  SR ¶¶ 110-111.  Furthermore, there is no allegation in the Complaint that MoeGo's frontend code or user interfaces are trade secrets.  When pressed about the distinction between Moement's costs to

develop the various components of the entire MoeGo system, Sebold repeatedly asserted that she did not separate the development costs for the development of the different software elements for Opinion 2 and even claimed she had "not seen a breakdown between front end, backend, et cetera." Sebold Depo. 63:19-66:1.

Sebold's Opinion 2 is not a reliable or helpful calculation of the "unjust enrichment caused by the misappropriation of the trade secret" because it lumps in costs other than those attributable only to the trade secret and must be excluded.

## C.    Sebold's Opinion 4 of a "Reasonable Royalty Rate" Is Unreliable, Unhelpful, and Inadmissible Opinion.

*1.    Reasonable Royalty is Not a Jury Theory for Trade Secret.*

Under California law, if "neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited," such that a reasonable royalty rate is the province of the judge, not the jury.  Cal. Civ. Code § 3426.3 (b); *see also Atl. Inertial Sys., Inc. v. Condor Pac. Indus. of California, Inc.*, 545 F. App'x 600, 601 (9th Cir. 2013) (remanding for the trial judge to determine reasonable royalty if any after adverse finding by jury of no harm due to trade secret misappropriation).  Sebold's report in the section for Opinion 4 at SSR ¶ 113. fn. 56 cited *Copart, Inv. C. Sparta Consulting, Inc.*, which stands for the same proposition. 277 F.Supp.3d 1127, 1155 (E.D. Cal. 2017) (denying damages summary judgment).

*2.    Sebold's Royalty Rate is Not Based on Comparable Licenses.*

In developing her "Reasonable Royalty Rate" calculation, Sebold's report cites as "industry precedent" a survey of licenses disclosed in SEC filings between 1994 and 2009.  SSR ¶ 114, see also Gebelin Decl. Ex. F (Varner Article).  At deposition, Sebold said she "aggregated some other royalties that are disclosed in SEC filings" but did not do any "separate analysis" to determine if those licenses were comparable to a hypothetical license for this case.  Sebold Depo. 71:17-72:2.  Although Sebold

mentioned she was familiar with the *Georgia Pacific* factors[9] for determining a reasonable royalty she did not locate any licenses that were comparable and was just "using the information" that she found "in this technology space."

3.    *Sebold Provides No Good Explanation to Extend the Royalty Rate Post Trial.*

As with her Opinion 1- Lost Profits as discussed in section IV.A.2 above, Sebold improperly extends her reasonable royalty rate damages through the end of December 2027, more than three years after trial. There is no legal justification for such extension, and her report provides no factual justification.

**V. Conclusion.**

For the foregoing reasons, Defendants respectfully request that the Court exclude the challenged portions of Sebold's opinions and related testimony and evidence – Opinion 1 "Lost Profit Damages", Opinion 2 "Costs Attributable to the Development of MoeGo", and Opinion 4 "Reasonable Royalty", or at a minimum those portions that are clearly speculative and contrary to law.


Dated: August 28, 2024         /s/ *Steven T. Gebelin*
                                Attorney
                                For Lesowitz Gebelin LLP,
                                Counsel for Defendants Groomore, Inc. and
                                Chiinliang Lin


LR 11-6.2 CERTIFICATION OF WORD COUNT: The undersigned, counsel of record for Defendants Chunliang Lin and Groomore, Inc., certifies that the foregoing memorandum of points and authorities, including headings, footnotes, and quotations but excluding the caption, the table of contents, the table of authorities, the signature

---

[9] *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), modified sub nom. Georgia-Pac. Corp. v. U.S. Plywood-Champion Papers, Inc., 446 F.2d 295 (2d Cir. 1971) (listing 15 factors, starting with the royalties received for the licensing of the same patent, rates for comparable patents, nature and scope of license, and others).

1  block, the certification required by L.R. 11-6.2, and any indices and exhibits, contains

2  5,881 words, which complies with the word limit of L.R. 11-6.1.

3
                                        /s/ *Steven T. Gebelin*
4                                        Attorney
                                        For Lesowitz Gebelin LLP,
5                          Counsel for Defendants Groomore, Inc. and Chiinliang Lin

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28